The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 31, 2020

## 2020COA178

**No. 19CA1724, *Tuscany Custom Homes, LLC v. Westover* —
Courts and Court Procedure — Mediation — Dispute Resolution
Act — Confidentiality**

A division of the court of appeals considers the scope and
application of the statutory protection for mediation
communications, which renders a mediation communication
generally inadmissible in a judicial proceeding. The division
concludes that this protection applies to a mediation
communication as well as to evidence that discloses information
concerning a mediation communication — such as an unsigned,
post-mediation writing offered to prove the existence and terms of
an oral agreement reached during a mediation proceeding. Because
such an unsigned writing is inadmissible, a party cannot prove the
existence or terms of an agreement reached at mediation unless it is

reduced to writing and fully executed or the party can present other, admissible evidence of the agreement. Because the district court here erroneously relied on evidence that disclosed mediation communications when the court found that the parties created an oral settlement agreement during a mediation proceeding, we reverse the court's order and remand for further proceedings.

COLORADO COURT OF APPEALS                  **2020COA178**

_____

Court of Appeals No. 19CA1724
Larimer County District Court No. 18CV30468
Honorable Thomas R. French, Judge

_____

Tuscany Custom Homes, LLC, a Colorado limited liability company,

Plaintiff-Appellee,

v.

John B. Westover; Wolf 359 Investments, LLC; and AIL Fossil Creek, LLC,

Defendants-Appellants,

and

John R. Platenak and Cynthia Platenak,

Third-Party Defendants-Appellees.

_____

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE NAVARRO
Tow and Lipinsky, JJ., concur

Announced December 31, 2020

_____

Messner Reeves LLP, Haley W. Maglieri, Katherine Otto, Daniel J. DeLay, Denver, Colorado, for Plaintiff-Appellee

Johnson Law, Chad W. Johnson, Tessa R. DeVault, Andrew J. King, Denver, Colorado, for Defendants-Appellants

March & Olive, LLC, Stewart W. Olive, Fort Collins, Colorado, for Third-Party Defendants-Appellees

¶ 1 This appeal concerns the scope and application of the statutory protection for mediation communications, which renders a mediation communication generally inadmissible in a judicial proceeding. *See* § 13-22-307(2)-(3), C.R.S. 2020. Distinguishing *Yaekle v. Andrews*, 195 P.3d 1101 (Colo. 2008), in part, we conclude that this protection applies to a mediation communication as well as to evidence that discloses information concerning a mediation communication — such as an unsigned, post-mediation writing offered to prove the existence and terms of an oral agreement reached during a mediation proceeding. Because such an unsigned writing is inadmissible, a party cannot prove the existence or terms of an agreement reached at mediation unless it is reduced to writing and fully executed or the party can present other, admissible evidence of the agreement. Because the district court here erroneously relied on evidence that disclosed mediation communications when the court found that the parties created an oral settlement agreement during a mediation proceeding, we reverse the court's order and remand for further proceedings.

1

## I.     Factual and Procedural History

¶ 2     Appellants are John B. Westover and two limited liability companies of which Westover is a member: Wolf 359 Investments, LLC; and AIL Fossil Creek, LLC (collectively, the Westover Defendants).  The Westover Defendants entered into contracts for the construction, purchase, and sale of a home in Fort Collins. Appellee Tuscany Custom Homes, LLC (Tuscany), agreed to construct the home and sell it to the Westover Defendants, who in turn would sell the home to appellees John R. and Cynthia Platenak.  Tuscany ultimately sued the Westover Defendants for breach of contract.  The Westover Defendants joined the Platenaks as third-party defendants.

¶ 3     The parties went to mediation on March 25, 2019.  On that day, the mediator encountered technical difficulties with his computer, and the parties concluded the mediation without signing any document memorializing an agreement.  Instead, the mediator returned to his office and sent the parties the following email (the mediator's email):

Dear Counsel,

I would like to thank each of you and your respective clients for your hard work today in reaching a resolution . . . . The purpose of this email is to summarize the terms of the settlement reached today, which summary will be used to prepare a formal Mutual Release and Settlement Agreement that is to be prepared by [Tuscany's counsel]. The terms of the settlement are as follows . . . .

¶ 4 The mediator's email then listed seven terms detailing the amounts payable by and to each party under the terms of the purported settlement. Thereafter, the mediator wrote, "I request that all counsel review the above and email their assent to the above terms of settlement."

¶ 5 The parties and the mediator exchanged emails over the next week. In those emails, Tuscany's counsel and the Platenaks' counsel said the terms of the mediator's email were correct, with minor additions.

¶ 6 On March 28, Tuscany's counsel drafted and distributed a draft agreement (the Draft Agreement) that included the terms from the mediator's email and the additions. The Westover Defendants' counsel responded, "We don't have any changes. Provided there's no redlines, we'll get our clients to sign." But, while Tuscany and

3

the Platenaks signed the Draft Agreement, the Westover Defendants refused to do so.

¶ 7       In the underlying breach of contract action, Tuscany filed a motion to enforce a settlement agreement, and the Platenaks joined that motion.  These parties alleged that an oral settlement agreement was formed in the mediation proceeding on March 25, 2019, and they attached the mediator's email and the Draft Agreement as proof of the agreement and its terms.

¶ 8       In their response, the Westover Defendants denied that an enforceable agreement existed and attached a proposed agreement that was identical to the Draft Agreement except that it contained an additional paragraph (the Westover Draft).  That addition (Paragraph 19) specified that the agreement should not be construed to preclude the Westover Defendants from asserting future claims against various nonparties.  The Westover Defendants signed their attached draft, but Tuscany and the Platenaks did not.

¶ 9       Tuscany and the Platenaks deposed the mediator, who testified that the parties reached a settlement agreement during the mediation.  He also testified generally that the terms in his email

and the subsequent email chain accurately reflected the substance of that agreement.

¶ 10    The district court held a hearing on the motion to enforce the settlement agreement.  The Westover Defendants' new counsel objected that various items of evidence proffered by the other parties were inadmissible because they revealed confidential mediation communications.  Among the challenged evidence was the mediator's deposition testimony (which was read into the record), the mediator's email, the email chain following the mediator's email, and the Draft Agreement.  The court provisionally admitted the evidence, subject to its review of the supreme court's decision in *Yaekle.*

¶ 11    After the hearing, the district court entered a written order granting the motion, reasoning in pertinent part as follows:

> This Court finds that the objected to communications in [the mediator's email] and [the Draft Agreement] were not made in the presence of the mediator, were not connected to specific mediation services proceedings, and were typical settlement negotiations apart from the mediator and mediation.  Rather, the communications in [the mediator's email] and [the Draft Agreement] were made to express and confirm already agreed upon terms, to seek written assent to those previously agreed

5

upon terms, and were typical settlement negotiations apart from the mediation. The purpose of [the mediator's email] to counsel was to obtain written confirmation of what had previously been orally agreed to [by] the parties during the mediation. As such, the Court finds that [the mediator's email] and [the Draft Agreement] do not contain "mediation communications" under C.R.S. 13-22-302(2.5), which are confidential under C.R.S. 13-22-307.

Similarly, the court decided that the mediator's deposition testimony was admissible because the mediator's opinions that "there was a meeting of the minds between all parties at the mediation and that the case was settled at the mediation" were "not communications of what happened at the mediation but were [his] opinions as to the result of the mediation and the fact that an agreement was reached."

¶ 12    Relying on the evidence discussed above, the district court then found that the parties formed an enforceable oral contract "at the mediation" and that the terms of that agreement were contained in the mediator's email. The court also found that the absence of the Westover Draft's Paragraph 19 did not prevent enforceability of the parties' contract because the parties had not agreed to Paragraph 19 at the mediation and Paragraph 19 did not add a

material term.  The court, therefore, granted the motion to enforce the agreement.  In addition, the court awarded costs and attorney fees to the Platenaks pursuant to a prevailing-party clause in their real estate contract with the Westover Defendants.

¶ 13    The Westover Defendants appeal.

## II.    Settlement Agreement

¶ 14    The Westover Defendants' challenge to the district court's order is two-fold.  First, relying on the Dispute Resolution Act (the Act), sections 13-22-301 to -313, C.R.S. 2020, and on *Yaekle*, they contend that much of the evidence presented at the hearing was inadmissible because it revealed mediation communications.  Second, they argue that, absent the improper evidence, there was insufficient evidence to prove the existence of an enforceable agreement.  We agree with both points.

### A.    Standard of Review

¶ 15    We review a district court's evidentiary rulings for an abuse of discretion.  *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 16.  A district court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it rests on an erroneous interpretation of the law.  *Id.*

7

¶ 16    The evidentiary dispute in this case concerns the statutory protection for mediation communications. *See* § 13-22-307(2)-(3). Its scope and application are a question of statutory interpretation that we review de novo. *See McCoy v. People*, 2019 CO 44, ¶ 37. In construing a statute, our primary goal is to give effect to the legislature's intent. *Id.* To do so, we read the statute as a whole, give words their plain and ordinary meanings, and apply the ordinary rules of grammar and common usage. *Id.*

### B.    The Protection for Mediation Communications

¶ 17    The Act defines a "mediation communication" as "any oral or written communication prepared or expressed for the purposes of, in the course of, or pursuant to, any mediation services proceeding or dispute resolution program proceeding, including, but not limited to, any memoranda, notes, records, or work product of a mediator, mediation organization, or party." § 13-22-302(2.5), C.R.S. 2020. Excluded from this definition is a final written agreement reached as a result of a mediation service proceeding or dispute resolution proceeding, so long as the agreement has been fully executed. *Id.*

¶ 18    Except as otherwise provided by the Act, "[a]ny party or the mediator or mediation organization in a mediation service

8

proceeding or a dispute resolution proceeding shall not voluntarily disclose or through discovery or compulsory process be required to disclose any information concerning any mediation communication . . . ." § 13-22-307(2). "Any mediation communication that is disclosed in violation of [section 13-22-307] shall not be admitted into evidence in any judicial or administrative proceeding." § 13-22-307(3).

¶ 19 The Act permits the parties to present to a court a signed, written agreement resolving their dispute. § 13-22-308(1), C.R.S. 2020. If the court approves it, the agreement is enforceable as a court order. *Id.*

¶ 20 Our supreme court's *Yaekle* decision provides the seminal interpretation of the Act.[1] There, the parties reached a partial settlement agreement during mediation and memorialized its basic terms in a signed form they called the "September agreement." 195 P.3d at 1104. The mediator instructed one party to finalize the details of the settlement in "formal documents." *Id.* at 1104, 1110.

---

[1] The supreme court consolidated two cases for purposes of its decision in *Yaekle v. Andrews*, 195 P.3d 1101 (Colo. 2008). We discuss the other case, *Chotvacs v. Lish,* later in this opinion.

As instructed, the party drafted documents outlining the terms of the settlement (the October documents), but the October documents were not fully executed. *Id.* at 1110.

¶ 21     Over the next few months, Yaekle and Andrews engaged in "extensive discussions." *Id.* at 1105. After "nine correspondences" between the parties' attorneys, Andrews's attorney acceded to Yaekle's terms and sent him a revised agreement containing all the revisions Yaekle had demanded in the months following the mediation (the December agreement). *Id.* Yaekle advised the trial court overseeing the pending civil suit between the parties that they had reached a final agreement in December, but he asked for more time to evaluate it. Yaekle never signed the December agreement. Andrews moved to enforce that agreement.

¶ 22     Yaekle argued that an enforceable contract did not exist because section 13-22-308(1), under which parties may submit a signed written agreement for court approval, provided the "only process by which parties may form a binding agreement once mediation has begun." *Id.* at 1104. The supreme court rejected that argument, holding that the Act did not abrogate the common law of contracts. Therefore, the parties could form a binding

10

settlement agreement without a signed writing even after the parties had engaged in mediation. *Id.*

¶ 23 The supreme court then considered the admissibility of the various documents and communications. The court determined that the phrase "mediation communication" "does not cover all communications made with an eye to resolving the dispute once parties have agreed to mediation. Rather, 'mediation communications' are limited to those made in the presence or at the behest of the mediator." *Id.* at 1109.

¶ 24 Applying that standard, the court held that the September agreement was excepted from the definition of mediation communication because it was a fully executed written agreement. *See* § 13-22-302(2.5); *Yaekle*, 195 P.3d at 1110. The October documents, however, were protected mediation communications because the mediator instructed the parties to draft them and they were not fully executed. *Yaekle*, 195 P.3d at 1110-11. The ensuing correspondence and the December agreement were typical post-settlement negotiations that were not protected as mediation communications. *Id.* The admissible evidence showed that the parties "constructed a binding agreement at common law during

11

their negotiations in the months *following* the mediation session"; thus, the supreme court held that the December agreement was enforceable. *Id.* at 1104 (emphasis added).

## C. Analysis

¶ 25 Applying the Act and *Yaekle*, we conclude that the mediator's email and Draft Agreement disclosed mediation communications and were inadmissible. We further conclude that the remaining evidence is not sufficient to establish an enforceable agreement.

### 1. The Mediator's Email

¶ 26 Turning first to the mediator's email, the Act specifically defines "mediation communication" to include any "memoranda" or "notes" of a mediator. § 13-22-302(2.5). A memorandum includes "[a] written note or record outlining the terms of a transaction or contract." Black's Law Dictionary 1179 (11th ed. 2019); *see H.B. Zachry Co. v. O'Brien*, 378 F.2d 423, 424 n.1 (10th Cir. 1967) ("The legal definition of memorandum is: 'A writing, usually informal, containing the terms of a transaction.'" (quoting Random House, Dictionary of English Language (unabridged 1966))). The mediator's email outlined the terms of a contract allegedly formed during mediation, and the appellees do not dispute that the mediator

12

drafted the email. The appellees also acknowledge that, at the mediation, the parties agreed that the mediator would draft the summary and send it to the parties. Hence, the mediator's email was prepared "pursuant to" a "mediation services proceeding." § 13-22-302(2.5).

¶ 27 Still, Tuscany argues that the mediator's email is "akin" to the September agreement in *Yaekle* and thus is not a mediation communication. As explained, however, the September agreement was signed by both parties. *Yaekle*, 195 P.3d at 1110. For that reason, it satisfied the exception from a mediation communication for a "final written agreement" that "has been fully executed." § 13-22-302(2.5); *see* Black's Law Dictionary 714 (11th ed. 2019) ("[E]xecute" means "[t]o make (a legal document) valid by signing."); *see Atkinson v. Estate of Hook*, 374 P.3d 215, 219 (Wash. Ct. App. 2016) (same). Because the mediator's email was not fully executed, it is similar to the notes at issue in *Chotvacs v. Lish*, the case consolidated with *Yaekle*. There, a party offered the mediator's unsigned, handwritten notes outlining the terms of a proposed settlement reached during mediation. *Yaekle*, 195 P.3d at 1105. Because the document was not signed, the supreme court

13

concluded that the document did not satisfy the exception for "final, written, fully executed agreements" provided in section 13-22-302(2.5). *Id.* at 1112. Therefore, the mediator's notes "remain[ed] protected as confidential." *Id.* The same is true of the mediator's email here.

¶ 28 We are not persuaded otherwise by the Platenaks' assertion that the mediator's email is not a mediation communication because he sent it at the parties' behest. As noted, the Act's definition of "mediation communication" includes memoranda "of a mediator," and it does not distinguish between those prepared on the mediator's own initiative and those requested by the parties. *See* § 13-22-302(2.5). In any event, *Yaekle* held that a mediation communication is an oral or written communication that is made at the mediator's behest *or* in the mediator's presence. *Yaekle*, 195 P.3d at 1109. The mediator was surely present when he authored the email pursuant to the mediation services proceeding.

¶ 29 Given all this, we conclude that the mediator's email is a confidential mediation communication. The district court, therefore, erred by admitting it into evidence and considering it as

14

proof of a settlement agreement.  *See* § 13-22-307(3); *Yaekle*, 195 P.3d at 1112.

## 2.    The Draft Agreement

¶ 30    We next consider whether the district court abused its discretion by considering the Draft Agreement as evidence of an oral agreement formed during mediation.  Before addressing the merits of this issue, however, we first reject the Platenaks' contention that the doctrines of invited error and judicial estoppel bar the Westover Defendants from challenging the admission of the Draft Agreement.

### a.    Invited Error

¶ 31    The doctrine of invited error prevents a party from complaining on appeal of an error that he or she invited or injected into the case. *People v. Rediger*, 2018 CO 32, ¶ 34.  The Platenaks argue that, because the Westover Defendants submitted the Westover Draft in their pretrial filings and it was identical to the Draft Agreement except for the addition of Paragraph 19, they "cannot seek to exclude a document that they themselves placed before the [district] court."  We disagree.

¶ 32    In context, it appears that the Westover Defendants submitted the Westover Draft to support one of their two reasons why the

15

appellees could not prove an enforceable agreement. The Westover Defendants first argued that the evidence offered to prove that agreement (including the Draft Agreement) was inadmissible. In the alternative, they argued that Paragraph 19 was a material term upon which the parties had not yet agreed.

¶ 33 Importantly, however, the Westover Defendants did not urge the district court to admit the Westover Draft into evidence at the hearing. Instead, the Platenaks themselves asked the court to take judicial notice of the Westover Draft, and the court agreed to do so. But the court's evidentiary rulings at the hearing were provisional, pending its review of *Yaekle*. In its later written order, the court did not rule that the Westover Draft was admissible, did not rely on it as evidence of a contract formed during mediation, and mentioned it only when explaining why Paragraph 19 was not a material term that must be added to the parties' agreement reached at the mediation. At any rate, the Westover Defendants did not inject the error they assert on appeal.

b. Judicial Estoppel

¶ 34 The Platenaks assert judicial estoppel on identical reasoning — that is, that the Westover Defendants are estopped from

16

challenging the Draft Agreement's admissibility because the Westover Draft is a nearly identical document. We again disagree.

¶ 35 Judicial estoppel is a narrow doctrine that precludes a party from taking a position in a proceeding that is totally inconsistent with a position the party took earlier in the same or related proceeding in an intentional effort to mislead the court. *See Arko v. People*, 183 P.3d 555, 560 (Colo. 2008). The doctrine applies only where the party taking the positions was successful in maintaining the first position and received some benefit from that position. *See Estate of Burford v. Burford*, 935 P.2d 943, 948 (Colo. 1997) (listing elements of judicial estoppel).

¶ 36 The Westover Defendants did not succeed in their argument that Paragraph 19 of the Westover Draft was a material term that needed to be included in the parties' settlement agreement. So the Westover Defendants received no benefit from submitting the Westover Draft. Accordingly, judicial estoppel does not apply here.

### c. The Merits

¶ 37 Turning to the merits, the Westover Defendants argue that the Draft Agreement was an inadmissible mediation communication because it was made at the mediator's behest. We agree. We also

17

explain that it was inadmissible even if it had not been made at the mediator's behest.

¶ 38 To reiterate, the supreme court in *Yaekle* clarified that a statement made in the mediator's presence or at the mediator's behest falls within the ambit of "mediation communication" because it is a communication made pursuant to a mediation services proceeding. 195 P.3d at 1109; *see* § 13-22-302(2.5).

¶ 39 Here, the mediator told the parties that his "summary will be used to prepare a formal Mutual Release and Settlement Agreement that is to be prepared by" Tuscany's counsel. After another party's counsel asked about the status of the agreement a few days later, the mediator asked Tuscany's counsel for an update. She responded that she would complete the agreement the next day, which she did. When she distributed the Draft Agreement, she included the mediator among the recipients.

¶ 40 So the record indicates that the Draft Agreement was created at the mediator's behest. Like the October documents in *Yaekle*, therefore, the Draft Agreement constituted a confidential mediation communication. *Yaekle*, 195 P.3d at 1110.

¶ 41    Even if, however, the mediator did not instruct a party to prepare the Draft Agreement but, instead, the parties decided on this procedure at the mediation, our conclusion would not change.[2] The appellees contend that the Draft Agreement was simply "meant to memorialize" the terms to which the parties had agreed at the mediation. But that is why it was not admissible, even assuming that the Draft Agreement itself is not a mediation communication because it was not written in the presence, or at the behest, of the mediator.

¶ 42    Recall that section 13-22-302(2.5) defines mediation communication to include "any oral or written communication" expressed in the course of a mediation services proceeding. The parties could form an oral agreement during mediation only if they communicated to one another or the mediator the agreement's terms and their mutual assent to those terms during that proceeding. *See Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009) (discussing elements of a settlement

---

[2] The district court did not make a finding on whether the Draft Agreement was written at the mediator's behest or the parties' behest.

contract). Under the plain language of section 13-22-302(2.5), the statements forming the oral agreement allegedly reached during the mediation here are mediation communications.

¶ 43 Also recall that section 13-22-307(2) provides that a party "shall not voluntarily disclose . . . any information concerning a mediation communication." Yet the appellees offered the Draft Agreement into evidence for the sole purpose of proving that the parties orally communicated the terms of a settlement during a mediation proceeding. An oral statement's content is information concerning that statement. Hence, the appellees disclosed information concerning a mediation communication by offering the Draft Agreement to prove the terms of an oral agreement reached during mediation.

¶ 44 That disclosure was prohibited unless an exception applied. *See* § 13-22-307(2); *Yaekle*, 195 P.3d at 1112. The appellees provided no evidence that an exception, such as written consent to disclosure from all parties and the mediator, applied. *See* § 13-22-307(2)(a). Thus, the appellees improperly disclosed information concerning a mediation communication by offering the Draft Agreement as evidence of an alleged oral settlement

agreement even though not all parties had executed the Draft Agreement.

¶ 45    Contrary to the appellees' implication, *Yaekle* does not command a contrary conclusion. There, Andrews offered post-mediation documents and communications to prove the existence of an agreement formed *outside* a mediation proceeding, not *in* one. *See Yaekle,* 195 P.3d at 1110-11. None of that evidence was offered to prove what the parties said during mediation because Andrews sought to enforce the December agreement, which was formed months after the mediation proceeding and without the mediator's assistance. *Id.* at 1104. At most, the *Yaekle* court held that the mere fact that communications touch upon topics that might have been discussed at mediation is not enough to preclude their admission into evidence to prove a *post-mediation* agreement. *See id.* at 1110-11 (affirming the trial court's finding that "the parties had entered into a subsequent agreement regarding the dispute's settlement by way of the December agreement").

¶ 46    The *Yaekle* court did not hold that communications made "in the shadow of mediation" are admissible to prove what happened *during* mediation. *Id.* at 1111. Applying the plain language of the

21

Act in light of its structure, we hold that they are not admissible, absent an applicable exception.

¶ 47     As discussed, section 13-22-307(3) provides that any mediation communication disclosed in violation of section 13-22-307 shall not be admitted into evidence.  Under section 13-22-302(2.5), the only evidence of an agreement reached as a result of mediation that is excepted from the definition of mediation communication is a fully executed written agreement.  Such an agreement may be presented to a court and, if approved, shall be an enforceable court order.  § 13-22-308(1).  These provisions work in tandem to ensure that, in general, the only admissible evidence of an agreement reached during mediation is a signed written agreement.

¶ 48     In short, forming a contract is not the same as proving one.  "[W]hile common law contract principles are not suspended from operation during mediation, the evidence of contract formation *during mediation* other than final written and fully executed agreements is generally inadmissible."  *Yaekle*, 195 P.3d at 1112 (emphasis added).  Because such evidence is generally inadmissible, in the absence of other, admissible evidence, a party

cannot prove the existence or terms of an agreement reached at mediation unless the agreement is reduced to a writing and fully executed.

¶ 49    The appellees in this case offered the Draft Agreement solely to disclose, and it did disclose, confidential mediation communications.  Therefore, even if the Draft Agreement was not written at the mediator's behest, it was still inadmissible under section 13-22-307(3) because it documented communications made in the mediator's presence at the mediation.  In other words, evidence of a mediation communication can take different forms (e.g., testimonial, documentary, or audio/visual).  Regardless of the form of the evidence, it is inadmissible under the statute.  Otherwise, a party — after going through a mediation proceeding — could write down oral communications made during the mediation, not seek any other party's written assent to the document, and then submit the document as evidence of an agreement reached at the mediation, claiming that it is not a protected mediation communication because it was not written in the mediator's presence or at the mediator's behest.  That would be an absurd view of the statute, and we reject it.  *See Mesa Cnty. Land*

23

*Conservancy, Inc. v. Allen*, 2012 COA 95, ¶ 28 (noting that courts avoid interpreting statutes in a manner that would lead to absurd results).

¶ 50 Consequently, we conclude that the district court abused its discretion by admitting the Draft Agreement into evidence.

### 3. The Remaining Evidence

¶ 51 Having concluded that the mediator's email and the Draft Agreement were inadmissible, our final inquiry is whether the remaining evidence was sufficient to support the district court's finding that the parties formed an enforceable contract at the mediation. *See Yaekle*, 195 P.3d at 1112. We conclude that it was not.[3]

¶ 52 The existence of a contract is a question of fact. *Id.* at 1111. As the parties attempting to enforce a contract, Tuscany and the Platenaks bore the burden to establish its existence. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). To satisfy that burden, they needed to show by a preponderance of the evidence

---

[3] Because we reverse on this issue, we do not address the Westover Defendants' contention that the alleged oral agreement reached at mediation was unenforceable because it did not address a material term, Paragraph 19 of the Westover Draft.

that the parties not only agreed to all material terms but also that the terms themselves are sufficiently definite. *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001). We will defer to a district court's determination that a contract exists if competent evidence in the record supports that finding. *Yaekle*, 195 P.3d at 1111.

¶ 53     Putting aside the mediator's email and the Draft Agreement, the admitted evidence was (1) a transcript of the mediator's deposition testimony; (2) the hearing testimony of the parties and their attorneys; and (3) the email correspondence following the mediator's email.[4] But neither the mediator in the deposition nor the witnesses at the hearing testified to the agreement's terms except by general reference to the mediator's email and the Draft Agreement. Likewise, the correspondence that followed the mediator's email contains no independent evidence of the purported agreement's terms without reference to the mediator's email.

---

[4] Because the Westover Defendants on appeal do not challenge the admissibility of the mediator's deposition testimony, we express no opinion on whether that testimony, or the other witnesses' testimony about what happened in the mediation, was admissible. For the sake of our analysis only, we assume this evidence was properly admitted.

Because the mediator's email and the Draft Agreement were not admissible, the only evidence concerning the terms of the contract was testimony that (1) the parties had a "meeting of the minds" during mediation and (2) the terms of that agreement are reflected in two documents a court may not consider in evidence. That evidence was not sufficient to establish the terms of an agreement.

¶ 54 Nonetheless, the Platenaks maintain that the Westover Draft proved the terms of an agreement formed during mediation. As discussed, however, the district court did not ultimately admit the Westover Draft into evidence or consider it as evidence of a contract formed during mediation.

¶ 55 Nor was the Westover Draft admissible evidence of an agreement reached during mediation. As the Platenaks argue, the Westover Draft is essentially the Draft Agreement, which was not admissible for the reasons we have articulated. Unlike the December agreement in *Yaekle*, the Westover Draft does not reflect a post-mediation agreement — indeed, no one argues that it does. The only portion of the Westover Draft that perhaps does not disclose a mediation communication is Paragraph 19, which does not reflect a term of the parties' alleged agreement.

¶ 56    Because Tuscany and the Platenaks did not carry their burden to present sufficient admissible evidence of an enforceable settlement agreement, we reverse the order enforcing an agreement.

## III.    Attorney Fees

¶ 57    Lastly, the district court awarded the Platenaks attorney fees and costs pursuant to a prevailing-party clause in their real estate agreement with the Westover Defendants.  Because we reverse the order supporting that award, we necessarily reverse the court's determination that the Platenaks were entitled to fees and costs as a prevailing party.  *Bainbridge, Inc. v. Douglas Cnty. Bd. of Comm'rs*, 55 P.3d 271, 274 (Colo. App. 2002).  In addition, because the Platenaks have not prevailed on appeal, we deny their request for appellate attorney fees.  *See* C.A.R. 39.1.

## IV.    Conclusion

¶ 58    The order enforcing the agreement and awarding fees and costs is reversed, and the case is remanded for further proceedings consistent with this opinion.

JUDGE TOW and JUDGE LIPINSKY concur.

27